UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
COURTNEY WARREN,

                     Plaintiff,

     - against -

TIME WARNER CABLE INC.,

                     Defendant.
----------------------------------------------------------------X

**MEMORANDUM AND ORDER**
17-CV-4029 (RRM) (ST)

ROSLYNN R. MAUSKOPF, Chief United States District Judge.

Plaintiff Courtney Warren brings this action against Time Warner Cable, Inc., alleging (i) violations of Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*; (ii) failure to accommodate, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; and (iii) discrimination on the basis of disability, in violation of the New York City Human Rights Law, N.Y. City Admin. Code § 8–107.  (Compl. (Doc. No. 1).)  Before the Court is Plaintiff's motion for summary judgment (Notice of Motion (Doc. No. 29)), and Defendant's cross-motion for summary judgment (Notice of Motion (Doc. No. 33)).  For the reasons explained below, Plaintiff's motion is denied and Defendant's motion is granted.

## BACKGROUND

### I.    Factual Background

The relevant facts outlined below are drawn from the parties' Local Rule 56.1 Statements of Material Facts, as well as evidence submitted by the parties in connection with the motion for summary judgment.  Unless otherwise noted, the facts are undisputed.

Plaintiff Courtney Warren began her employment as a Customer Care Representative with Time Warner Cable Inc. ("Time Warner") in November 2014.  (Defendant's Rule 56.1 Statement ("Def.'s SOF") (Doc. No. 35) at ¶¶ 12–13; Plaintiff's Response to Defendant's Rule

56.1 Statement ("Pl.'s Resp. SOF") (Doc. No. 39) at ¶¶ 12–13.)  As a Customer Care

Representative, Warren's responsibilities were to answer customer calls; sell Time Warner cable,

telephone, and internet services; and troubleshoot customer problems.  (Def.'s SOF at ¶ 14; Pl.'s

Resp. SOF at ¶ 14.)  While Warren was employed as a Customer Sales Representative, Time

Warner tracked her performance using various metrics.  (Def.'s SOF at ¶¶ 20–21; Pl.'s Resp.

SOF at ¶¶ 20–21.)  The metrics used by Time Warner to track the performance of Customer Care

Representatives included the results of customer satisfaction surveys ("CSAT"), the rate at which

customers' needs were met on the first call ("FCR"), product sales from customer calls ("PSU"),

the rate at which technicians were dispatched following customer calls ("Dispatch Rate"), the

frequency with which customer calls were transferred to other Time Warner employees

("Transfer Rate"), and internal productivity ("IP").  (Defendant's Reply to Plaintiff's Responses

to Defendant's Rule 56.1 Statement of Facts ("Def.'s Reply Resp. SOF") (Doc. No. 41) at ¶ 21;

Plaintiff's Rule 56.1 Statement of Facts ("Pl.'s SOF") (Doc. No. 29-1) at ¶ 3.)  Warren was

aware of the performance goals set by Time Warner and was able to check her performance

relative to the target metrics.  (Pl.'s Resp. SOF at ¶ 23; Def.'s Reply Resp. SOF at ¶ 23.)  During

Warren's employment, Time Warner evaluated employee performance using evaluation periods

of 30-day fiscal months.  (Pl.'s Resp. SOF at ¶ 24; Def.'s Reply Resp. SOF at ¶ 24.)  The fiscal

month began on the 19th day of the preceding calendar month and ended on the 18th day of the

calendar month. (*Id.*)

**A.  Warren's Employment and Performance**

For most of her employment, including at the time of her termination, Warren's direct

supervisor was Alicia Browne.  (Pl.'s Resp. SOF at ¶ 16; Def.'s Reply Resp. SOF. at ¶ 16.)

Warren and Browne had a good working relationship.  (Pl.'s Resp. SOF at ¶ 25; Def.'s Reply

Resp. SOF at ¶ 25.)  Throughout Warren's first year of employment with Time Warner, there were issues with her performance that she was working on improving.  (Pl.'s Resp. SOF at ¶ 29; Def.'s Reply Resp. SOF at ¶ 29.)  Warren was counseled about her performance by her supervisors, including Browne, approximately once every two to three weeks throughout her employment, from January 2015 through April 2016.  (Pl.'s Resp. SOF at ¶ 27; Def.'s Reply Resp. SOF at ¶ 27.)

In May 2015, Warren's performance goals were to have a CSAT at or above 87%; FCR at or above 75%; IP at or above 88%; a Dispatch Rate at or below 10%, PSU at or above 4; and a Transfer Rate at or below 20.  (Pl.'s SOF at ¶ 4; Defendant's Response to Plaintiff's Rule 56.1 Statement of Facts ("Def.'s Resp. SOF") (Doc. No. 32) at ¶ 4.)[1]  Warren received her first documented performance counseling, signed by Browne, on May 27, 2015.  (Pl.'s Resp. SOF at ¶ 32; Def.'s Reply Resp. SOF at ¶ 32.)  The document reported that Warren had received individual coaching eight times and "calibration" three times between fiscal March and fiscal May 2015, and that "[d]espite coaching and training provided, [Plaintiff] continue[s] to fail to consistently incorporate communication behaviors or yield performance results as expected." (*Id.*)  The counseling document also encouraged Warren to "provide … input and/or rebuttal" and warned: "[I]mmediate and sustained improvement of the stated deficiencies must occur. Future violations of any company policies and/or procedures whether or not specifically addressed above may result in further disciplinary action, up to and including termination." (Def.'s SOF at ¶¶ 33–34; Pl.'s Resp. SOF at ¶ 33–34.)

---

[1] In her 56.1 Statement, Warren reports that these performance goals were for May 2017.  Because Warren was not employed with Time Warner in 2017, and because Warren refers to these goals in the context of her 2015 performance review, the Court assumes May 2015 is the correct date and 2017 is a typographical error.

In the twelve-week period between May 27, 2015, and August 25, 2015, Warren received eight instances of coaching from Browne.  (Def.'s SOF at ¶ 36; Pl.'s Resp. SOF at ¶ 36.)  On August 25, 2015, Warren received a Written Warning for continuing to fail to meet performance objectives, signed by Browne.  (Def.'s SOF at ¶ 37; Pl.'s Resp. SOF at ¶ 37.)  The Written Warning noted that Warren met with Browne three times in July and August 2015 to discuss ways to meet performance expectations and reported that Warren struggled to consistently incorporate coached behaviors or "yield performance results as expected."  (*Id.*)  The Written Warning encouraged Warren to "provide … input and/or rebuttal" and again warned Warren: "[I]mmediate and sustained improvement of the stated deficiencies must occur. Future violations of any company policies and/or procedures whether or not specifically addressed above may result in further disciplinary action, up to and including termination."  (Def.'s SOF at ¶¶ 38–39; Pl.'s Resp. SOF at ¶¶ 38–39.)  Warren's performance goals were changed to a CSAT at or above 90%; FCR at or above 75%; a Dispatch Rate at or below 7.3%, PSU at or above 10; and a Transfer Rate at or below 14.5.  (Pl.'s SOF at ¶ 7; Def.'s Resp. SOF at ¶ 7.)

Warren's 2015 Performance Review, drafted by Browne, gave her an overall performance rating of "Partially Meets Expectations" based on her performance metrics from the 2015 year.  (Pl.'s SOF at ¶ 10; Def.'s Resp. SOF at ¶ 10.)  Specifically, Warren received a rating of "Partially Meets Expectations" for the FCR, PSU, and CSAT metrics, and a rating of "Does Not Meet Expectations" for her Dispatch Rate.[2]  (Pl.'s Resp. SOF at ¶¶ 44–46; Def.'s Reply Resp. SOF at ¶¶ 44–46.)  In the 2015 Performance Review, Warren was encouraged to "continue to seek out feedback and focus on implementing the feedback provided in her day to day

---

[2] The parties inadvertently agree that Warren her "Does Not Meet Expectations" rating for her FCR metric. (Def.'s Reply Resp. SOF at ¶ 46.) The record shows she received a "Partially Meets Expectations" rating for that metric. (Declaration of Kimberley E. Lunetta in Support of Defendant's Motion for Summ. J., Exhibit I ("Exhibit I") (Doc. No. 37–9) at TWC_000128.)

4

routine." (*Id.*)  Warren was placed on a Performance Action Plan ("PAP") on February 16, 2016. (Def.'s SOF at ¶ 52; Pl.'s SOF at ¶ 11.)  Warren received her 2015 Performance Review and her PAP on February 18, 2016.  (Def.'s Reply Resp. SOF at ¶¶ 42, 53.)  The PAP, signed by Warren on February 18, 2016, stated that "[i]mmediate improvement is expected within 30 days. At 60 days, a final review of your performance results will be completed."  (Pl.'s Resp. SOF at ¶ 54; Def.'s Reply Resp. SOF at ¶ 54.)  The PAP also stated that Warren's performance data would be collected and evaluated, and that meeting performance goals and expectations over the course of the successive fiscal months would be critical to Warren's completion of the PAP.  (Pl.'s Resp. SOF at ¶ 55; Def.'s Reply Resp. SOF at ¶ 55.)  The PAP also encouraged Warren to "provide [her] input and/or rebuttal" and stated that Browne "remain[ed] available to help [Plaintiff] and discuss areas where [she] require[d] additional support."  (Def.'s SOF at ¶ 56; Pl.'s Resp. SOF at ¶ 56.)  During the PAP period, Warren monitored her performance electronically on a regular basis.  (Def.'s SOF at ¶ 59; Pl.'s Resp. SOF at ¶ 59.)

On April 6, 2016, Browne met with Warren to discuss her performance during the March 2016 fiscal month.  (Pl.'s Resp. SOF at ¶ 61; Def.'s Reply Resp. SOF at ¶ 61.)  In the March 2016 fiscal month, Warren's Customer Satisfaction rating was 88.39%; her FCR was 78.52%; her Dispatch Rate was 8.73%; her IP was 89.65%; her Transfer Rate was 8.5%; and her PSU was 4.  (Def.'s SOF at ¶ 120; Pl.'s Resp. SOF at ¶ 120.)  The Performance Improvement/Corrective Action Form given to Warren at the April 6, 2016, meeting stated that Warren "failed to yield performance results in Customer Satisfaction, Dispatch Rate and Sales (PSU) as expected" and that in the next 30 days it was "expected that her current performance show measurable and sustained improvement and … meet the department metrics and standards."  (Def.'s SOF at ¶ 62; Pl.'s Resp. SOF at ¶ 62.)  The Performance Improvement/Corrective Action form compared

Warren's performance during the March 2016 fiscal month in "Key Performance Metrics" to her 2015 performance metrics, showing that three out of the six metrics – CSAT, Dispatch Rate, and PSU – for the March 2016 fiscal month did not meet expectations.  (Def.'s SOF at ¶ 63; Pl.'s Resp. SOF at ¶ 63.)  The Performance Improvement/Corrective Action Form also encouraged Warren to "provide [her] input and/or rebuttal" and stated that Browne "remain[ed] available to help [Plaintiff] and discuss areas where [she] require[d] additional support."  (Def.'s SOF at ¶ 63; Pl.'s Resp. SOF at ¶ 64.)  Browne told Warren that she was improving and she should "keep doing what [she was] doing."  (Pl.'s SOF at ¶ 19; Def.'s Resp. SOF at ¶ 19.)

The Performance Improvement/Corrective Action Form further states that Time Warner would review Warren's "performance on or about 30 days from the receipt of this document" and that the PAP affords Warren "the opportunity to correct this behavior."  (Pl.'s SOF at ¶ 17; Def.'s Resp. SOF at ¶ 17.)

Warren signed the Performance Improvement/Corrective Action Form on April 6, 2016. (Pl.'s Resp. SOF at ¶ 66; Def.'s Reply Resp. SOF at ¶ 66.)  Browne's supervisor indicated in review of the Performance Improvement/Corrective Action Form that Warren had "demonstrated improvement," and Browne had not "fulfilled her 1-on-1 coaching commitment."  (Pl.'s SOF at ¶ 61; Def.'s Resp. SOF at ¶ 61.)  Warren understood that, as of April 6, she was falling short of the performance expectations in her PAP and that if she did not meet those expectations at the conclusion of her 60-day PAP period, she could be terminated.  (Def.'s SOF at ¶ 70; Pl.'s Resp. SOF at ¶ 70.)

## B.  Warren's Grandmother's Death and Subsequent Leave

On April 8, 2016, Warren's grandmother passed away.  (Pl.'s SOF at ¶ 26; Def.'s Resp. SOF at ¶ 26.)  Warren informed Browne and another manager of her grandmother's death.  (Pl.'s

SOF at ¶ 29; Def.'s Resp. SOF. at ¶ 29.)  At that time, Warren did not request time off from

work.  (Def.'s SOF at ¶ 72; Pl.'s Resp. SOF at ¶ 72.)  Warren testified that she was shocked by

the news of her grandmother's death and that she had a panic attack at work after she learned that

her grandmother had died.  (Pl.'s SOF at ¶¶ 28, 32; Def.'s Resp. SOF at ¶¶ 28, 32.)  On April 10,

2016, Time Warner supervisor Earl Bennett observed Warren on her cell phone taking a personal

call while at work, which was disallowed under Time Warner policy.  (Def.'s SOF at ¶¶ 73–75;

Pl.'s Resp. SOF at ¶¶ 73–75.)  Bennett told Warren not to use her cell phone while at work, and

she informed him she was using her phone to talk with her sister about their grandmother's

death.  (Def.'s SOF at ¶ 77; Pl.'s Resp. SOF at ¶ 77.)  Warren was not disciplined for using her

cell phone at work.  (Def.'s SOF at ¶ 76; Pl.'s Resp. SOF at ¶ 76.)  Warren appeared to be upset

and crying following her conversation with Bennett.  (Def.'s SOF at ¶ 80; Pl.'s Resp. SOF at ¶

80.)  The parties dispute whether Warren was sent home after she appeared to be upset and

crying.  (Pl.'s SOF at ¶ 31; Def.'s Resp. SOF at ¶ 31.)  Warren did not work on April 11–12,

2016.  (Def.'s SOF at ¶ 81; Pl.'s Resp. SOF at ¶ 81.)  Warren was granted five days of

bereavement leave for April 13–17, 2016.  (*Id.*)

    After Warren's bereavement leave, she applied for FMLA leave on April 22, 2016, for

what Warren described as anxiety and depression.  (Def.'s SOF at ¶ 88; Pl.'s Resp. SOF at ¶ 88.)

In her request for FMLA leave, Warren listed her diagnosis as

"Stress/Anxiety/Depression/Behavioral Health Condition" but noted she had not yet seen a

psychiatrist.  (Def.'s SOF at ¶ 90; Pl.'s Resp. SOF at ¶ 90.)  Time Warner's leave administrator

granted Warren FMLA leave from April 20, 2016 through June 30, 2016.  (Pl.'s SOF at ¶ 38;

Def.'s Resp. SOF at ¶ 38.)  Time Warner also granted Warren short-term disability leave

("STD") from April 29, 2016, through June 30, 2016.  (Pl.'s SOF at ¶ 39; Def.'s Resp. SOF at ¶

7

39.)  On April 22, 2016, Browne informed Time Warner Human Resources that Warren was on leave beginning April 20, 2016.  (Def.'s SOF at ¶ 91; Pl.'s Resp. SOF at ¶ 91.)

Warren saw a psychiatrist, Dr. Fatakhova, on May 3, 2016; May 10, 2016; May 26, 2016; and August 24, 2016.  (Def.'s SOF at ¶ 93–94; Pl.'s Resp. SOF at ¶ 93–94.)  On May 10, Dr. Fatakhova submitted a form supporting Warren's FMLA leave, which stated the beginning date of Warren's FMLA leave was April 20, 2016, and the end date was June 30, 2016.  (Def.'s SOF at ¶ 95; Pl.'s Resp. SOF at ¶ 95.)  Dr. Fatakhova reported that she had diagnosed Warren with Bipolar II disorder based on her presenting symptoms.  (Pl.'s SOF at ¶ 40; Def.'s Resp. SOF at ¶ 40.)  Time Warner's leave administrator approved Warren's leave on May 17, 2016.  (Pl.'s Resp. SOF at ¶¶ 96–97; Def.'s Reply Resp. SOF at ¶¶ 96–97.)

### C.  Warren's Termination

For the April 2016 fiscal month, Warren's Customer Satisfaction rating was 85.53%; her FCR was 75.53%; her Dispatch Rate was 11.18%; her IP was 89.78%; her Transfer Rate was 5.81%; and her PSU was 5.  (Def.'s SOF at ¶ 121; Pl.'s Resp. SOF at ¶ 121.)  Warren's performance metrics at the end of the April 2016 fiscal month demonstrated improvement in FCR, Transfer Rate, and IP, but Warren did not meet performance expectations for CSAT, Dispatch Rate or PSU.  (Def.'s SOF at ¶ 82; Pl.'s Resp. SOF at ¶ 82.)  After the performance results for the April 2016 fiscal month were distributed, Browne submitted a draft of Warren's PAP 60-day Form.  (Def.'s SOF at ¶ 82; Pl.'s Resp. SOF at ¶ 82.)  Browne testified that Warren should have received a "Final Written Warning," but also testified that Final Written Warnings were not required prior to a termination.  (Pl.'s SOF at ¶ 54; Def.'s Resp. SOF at ¶ 54.)

Time Warner supervisory employee Alec Miller submitted a recommendation of termination of Warren's employment based upon Warren's performance during the 60-day PAP,

which he noted had concluded before her leave on April 20, 2016.  (Def.'s SOF at ¶ 84; Pl.'s Resp. SOF at ¶ 84.)  On May 16, 2016, Time Warner supervisory employees Lynn Merrilees and Imani Breaker approved Miller's recommendation to terminate Warren's employment based upon her performance for the March 2016 and April 2016 fiscal months. (Def.'s SOF at ¶ 85; Pl.'s Resp. SOF at ¶ 85.)  On May 19, 2016, Time Warner supervisory employee Nneka Cummings Baxter forwarded the recommendation to terminate Warren's employment to Time Warner Senior Manager, Human Resources Valerie Tingle and Director, Human Resources Daymion M. Montanez de Zuinga.  (Def.'s SOF at ¶ 86; Pl.'s Resp. SOF. at ¶ 86.)  Also on May 19, 2016, Tingle and Montanez de Zuinga provided final approval of the decision to terminate Warren's employment with Time Warner based upon her performance for the March 2016 and April 2016 fiscal months.  (Def.'s SOF at ¶ 87; Pl.'s Resp. SOF at ¶ 87.)

At some point during this process, Baxter remembers thinking that "it seemed like a coincidence" that Warren learned she was not performing on her PAP, and then "all of a sudden she is absent."  (Pl.'s SOF at ¶ 69; Def.'s Resp. SOF ¶ 69.)  Baxter further testified that she had a conversation in which she voiced that "it seems a coincidence where she was informed that she would be separated that she disappeared."[3]  (Pl.'s SOF at ¶ 69; Def.'s Resp. SOF ¶ 69.)  On July 1, 2016, the day Warren returned from her leave, she was notified that her employment with Time Warner had been terminated.  (Pl.'s SOF at ¶ 66; Def.'s Resp. SOF at ¶ 66.)

---

[3] The parties do not specify when this conversation occurred or who it was with.  The record indicates only that Baxter described having the conversation with an unnamed "we."  (Plaintiff's Motion for Summary Judgment, Exhibit 9 (Doc. No. 30-9), at 103:14–18.)

### D.  Comparison with Other Time Warner Employees

#### a.  Anthony Schlechter

Anthony Schlechter was employed as a Customer Care Representative at Time Warner from 2012 to 2016.  (Def.'s SOF at ¶¶ 116, 118; Pl.'s Resp. SOF at ¶¶ 116, 118.)  Schlechter and Warren had the same supervisor, Alicia Browne.  (Def.'s SOF at ¶ 117; Pl.'s Resp. SOF at ¶ 117.)  Like Warren, Schlechter was placed on a PAP for the March 2016 and April 2016 fiscal months, based on his 2015 performance.  (Def.'s SOF at ¶ 118; Pl.'s Resp. SOF at ¶ 118.)  Schlechter and Warren had the same performance metric goals for their PAPs.  (Def.'s SOF at ¶ 119; Pl.'s Resp. SOF at ¶ 119.) These performance goals included a CSAT at or above 90%; FCR at or above 75%; Dispatch Rate at or below 7.3%; IP above 88.5%; Transfer Rate at or below 14.5%; and PSU at or greater than 10.  (Def.'s SOF at ¶ 120; Pl.'s Resp. SOF at ¶ 120.)  In the March 2016 fiscal year, Schlechter's CSAT was 89.71%; his FCR was 76.51%; his Dispatch Rate was 10.57%; his IP was 91.83%; his Transfer Rate was 15.67%, and his PSU was 3.  (*Id.*)  Accordingly, he met his goal for FCR and IP, was within one percentage point of meeting his goal for CSAT, and failed to meet his goals for Dispatch Rate, Transfer Rate, and PSU.  (*Id.*)  In the April 2016 fiscal year, Schlechter's CSAT was 89.19%; his FCR was 77.91%; his Dispatch Rate was 11.26%; his IP was 89.96%; his Transfer Rate was 17.29%; and his PSU was 2.  (Def.'s SOF at ¶ 121; Pl.'s Resp. SOF at ¶ 121.)

Schlechter's employment was terminated for failure to meet the goals stated in his PAP.  (Def.'s SOF at ¶ 123; Pl.'s Resp. SOF at ¶ 123.)  Schlechter's termination document was dated May 5, 2016, and signed on May 19 and 20, 2016.  (Def.'s SOF at ¶ 124; Pl.'s Resp. SOF  at ¶124.)  Prior to his termination, Schlechter was given a Written Warning, followed by a Final Written Warning.  (Pl.'s SOF at ¶¶ 51–52; Def.'s Resp. SOF at ¶¶ 51–52.)  Schlechter never took

or applied for FMLA leave and never purported to have a disability.  (Pl.'s Resp. SOF at ¶¶ 125–26; Def.'s Reply Resp. SOF at ¶¶ 125–26.)

### b.  Gina Dell

Gina Dell was also employed by Time Warner and identified by Time Warner as a possible comparator.  (Pl.'s SOF at ¶ 49; Def.'s Resp. SOF at ¶ 49.)  Dell passed her PAP after failing to meet its stated goals during the first fiscal month and was not terminated.  (Pl.'s SOF at ¶ 50; Def.'s Resp. SOF at ¶ 50).  Dell received a Final Written Warning.  (Pl.'s SOF at ¶ 49; Def.'s Resp. SOF at ¶ 49.)

## II.    Plaintiff's Claims

Warren filed the instant action against Time Warner on July 6, 2017. (Compl. (Doc. No. 1).)  Her complaint includes seven causes of action.  Her first cause of action, brought under the ADA, alleges that Time Warner engaged in an unlawful discriminatory practice by discriminating against her because defendant perceived she was disabled and retaliating against her for engaging in protected activities.  (*Id*. at 4–5.)  Her second cause of action, brought under the FMLA, alleges that Time Warner interfered with Warren's exercise of her rights under the FMLA and retaliated against her for taking leave.  (*Id*. at 5.)  The remaining causes of action allege state law claims brought under the NYCHRL for disability discrimination, failure to accommodate, retaliation, and aiding and abetting retaliation.  (*Id.* at 6–8.)

## III.    Plaintiff's Motion for Summary Judgment

Warren now moves for summary judgment on all of her claims.  (Notice of Motion.)  Warren first argues that she has demonstrated that she suffered FMLA interference because Time Warner did not provide her the full length of her allowed time under the PAP, instead terminating her while she was on FMLA leave and denying her the benefit of restoration.

(Plaintiff's Memorandum of Law in Support ("Mot.") (Doc. No. 29-2) at 11.)  Warren further

argues that comparator employees Anthony Schlechter and Gina Dell, who were also placed on

PAPs, were given 90 days to complete them and issued Final Written Warnings, to which

Warren was also entitled.  (*Id.* at 12.)  Time Warner argues in response that Warren's 60-day

PAP ended on April 18, 2016, prior to Warren's FMLA leave, and Schlechter and Dell also

received 60 days to complete their PAPs.  (Defendant's Memorandum of Law in Opposition

("Opp. Mot.") (Doc. No. 31) at 3, 7.)  In her reply, Warren argues that no document states that

the PAP ended on April 18, 2016, and the materials provided to Warren during her 30-day

review on April 6th indicated that she had an additional 30 days after that date to demonstrate

improvement.  (Plaintiff's Memorandum of Law in Opposition to Defendant's Cross-Motion for

Summary Judgment and in Reply and Further Support of Her Motion ("Cross-Opp.") (Doc. No.

38) at 3.)  Warren also reiterates that Schlechter and Dell received 90 days to complete their

PAPs, and Warren was entitled to the same.  (*Id.* at 3–4.)

  Warren next argues that she has established a prima facie case for FMLA retaliation, and

Time Warner has failed to provide a legitimate, non-discriminatory reason for her termination.

(Mot. at 13.)  Warren points to the close temporal proximity between her FMLA leave and her

termination, alleged preferential treatment of Schlechter and Dell, as well as a remark made by

Baxter suggesting she doubted Warren's motivations for taking FMLA leave, as circumstances

giving rise to an inference of discrimination.  (Mot. at 15.)  Time Warner argues in response that

Schlechter and Warren were both terminated at the end of their PAPs and were therefore treated

equally, and Dell successfully completed her PAP so she was not subject to termination.  (Opp.

Mot. at 7.)  Time Warner further argues that Baxter's comment was based on a good faith belief

that Warren was abusing FMLA leave and did not demonstrate a retaliatory motive.  (Opp. Mot.

at 5–6.)   Finally, Time Warner argues that Warren's termination was a legitimate business decision motivated by Warren's poor performance at work prior to her FMLA leave, which demonstrated that she was not qualified for the position.  (Opp. Mot. at 5–6.)  In her reply, Warren responds to this alleged non-discriminatory motive for termination that she was unfairly terminated after having to take bereavement leave that began during her PAP period, and because she was denied the opportunity to complete her PAP, Time Warner cannot demonstrate that it would have fired her regardless of whether she had taken leave. (Cross-Opp. at 7.)

Finally, Warren argues that she has established a prima facie case for discrimination under the ADA because Time Warner failed to extend the time in which she could complete her PAP, thus denying her a reasonable accommodation.  (Mot. at 19.)  Time Warner argues in response that Warren was not disabled during her PAP period and neither requested nor was entitled to an accommodation during her PAP period.  (Opp. Mot. at 9, 12.)  Warren argues in response that her bereavement leave had essentially the same purpose as her FMLA leave because she took that leave after suffering a "breakdown in the workplace,"  thus putting Time Warner on notice that she required accommodations for a disability.  (Cross-Opp. at 6, 9.)

## IV.    Defendant's Cross-Motion for Summary Judgment

Time Warner cross-moves for summary judgment on all Warren's claims.  (Defendant's Memorandum of Law in Support of Cross-Motion for Summary Judgement ("Cross-Mot.") (Doc. No 34).)  First, Time Warner argues that Warren fails to show that she suffered FMLA interference because she was granted the full amount of FMLA leave she requested and her employment was terminated due to failure to complete her PAP before taking that leave.  (Cross-Mot. at 20.)  Warren argues in response that her bereavement leave, commencing April 10, 2016, should be considered protected leave under the FMLA.  (Cross-Op. at 5–7.)

13

Time Warner next argues that Warren fails to establish a prima facie case for FMLA retaliation, because Warren was not qualified for her position and there is no evidence giving rise to an inference of retaliatory intent. (Cross-Mot. at 23.)  Further, Time Warner argues that even if Warren had established a prima facie case for FMLA retaliation, that Time Warner's decision to terminate Warren's employment was a legitimate business decision based on Warren's poor work performance. (*Id.* at 24.)  Warren argues in response that Warren was qualified for her position, and Baxter's statement that it seemed like a "coincidence" that Warren took leave while she was on the PAP gave rise to an inference of retaliatory intent. (Cross-Opp. at 8.)

Finally, Time Warner argues that Warren fails to establish a prima facie case of disability discrimination under either the ADA or NYCHRL because she was not qualified for her position and could not perform her essential job functions, as demonstrated by her poor performance on her performance metrics both before and during her PAP. (Cross-Mot. at 10, 15.)  Further, Time Warner argues that Warren's termination was not related to her disability, because Time Warner had no notice that Warren was disabled prior to her FMLA leave. (*Id.* at 12–13.)  Finally, Time Warner argues that Warren's employment termination was a legitimate business decision based on her poor performance at work. (*Id.* at 16–18.)  Warren argues in response that her emotional response at work following the news of her grandmother's death put Time Warner on notice that she was disabled, and Time Warner failed to accommodate Warren's disability by extending her time to complete her PAP during Warren's absence for bereavement leave. (Cross–Opp. at 9.)

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).  A fact is "material" if it may impact the "outcome of the suit under

the governing law." *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue of material fact exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v.*

*City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

 In determining whether a genuine issue of material fact exists, the evidence of the non-

movant "is to be believed," and the Court must draw all "justifiable" or reasonable inferences in

favor of the non-moving party.  *Anderson*, 477 U.S. at 255 (citation omitted); *see also Rodriguez*

*v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) ("[T]he court is to draw all factual

inferences in favor of the party against whom summary judgment is sought, viewing the factual

assertions . . . in the light most favorable to the party opposing the motion."  (citations omitted)).

 Once the moving party has demonstrated that there is no genuine issue as to any material

fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come

forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks

omitted) (citation omitted); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)

(collecting cases and stating that the non-moving party "may not rely on conclusory allegations

or unsubstantiated speculation").  In other words, the non-movant must offer "concrete evidence

from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.

 The Court bears in mind that in discrimination cases "'smoking gun' evidence of

discriminatory intent is rare and most often must be inferred." *Forsyth v. Fed'n Employment &*

*Guidance Serv.*, 409 F.3d 565, 569 (2d Cir. 2005) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d

62, 69 (2d Cir. 2001)), *abrogated on other grounds*, *Ledbetter v. Goodyear Tire & Rubber Co.*,

550 U.S. 618 (2007).  Accordingly, the Second Circuit has "repeatedly emphasized 'the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent.'"  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).

## DISCUSSION

### I.    Warren's FMLA Claims

The FMLA was enacted "to entitle employees to take reasonable leave for medical reasons . . . for the care of a child, spouse or parent who has a serious health condition."  29 U.S.C. § 2601(b)(2).  The Act provides job security for employees who have "serious health conditions that prevent them from working for temporary periods."  29 U.S.C. § 2601(a)(4). Under the Act, an employee is entitled to take a total of twelve workweeks of leave during any twelve month period, for health related reasons, 29 U.S.C. § 2612(a)(1)(D), and upon returning from such leave, the employee is entitled to be restored to his position or an equivalent position.  29 U.S.C § 2614(a)(1).  If an employee is terminated during an FMLA leave, then the "burden is on the employer to prove that the employee is not entitled to reinstatement of her job because her job would have been eliminated during that same period, even if she had not taken leave."  *Kosakow v. New Rochelle Radiology Associates, P.C.*, 88 F. Supp. 2d 199, 209–10 (S.D.N.Y. 2000).  The FMLA prohibits an employer from interfering with an employee's exercise of his rights under the Act.  29 U.S.C. § 2615(a)(1).  Any eligible employee who was wrongfully denied benefits under the Act or who faced retaliation because of the exercise of her rights under the Act is authorized to bring a private action against the employer under the FMLA.  *See* 29 U.S.C.§§ 2615, 2617(a).

16

### A. Warren's FMLA Interference Claim

Interference claims are appropriate when "the employer in some manner impeded the employee's exercise of his or her right[s] afforded substantive protection under the FMLA." *Sista v CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006). The elements of an FMLA interference claim are "1) that she is an eligible employee under the FMLA; 2) that defendant is an employer as defined in FMLA; 3) that she was entitled to leave under FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under FMLA." *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 427 (S.D.N.Y. 2004). The employer's intent is not relevant to an FMLA interference claim. *Hill v. City of New York*, 136 F. Supp. 3d 304, 342 (E.D.N.Y. 2015), *citing Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).

However, the FMLA provides "no greater job security than that to which the employee would have been entitled to prior to taking leave." *Bergman v. Kids By the Bunch Too, Ltd.*, 14-CV-5005, 2018 WL 1402249 at *9 (E.D.N.Y. Feb. 16, 2018*), report and recommendation adopted*, 14-CV-5005, 2018 WL 1401324 (E.D.N.Y. Mar. 20, 2018), *citing Hale v. Mann*, 219 F.3d 61, 66 (2d Cir. 2000). "The law is clear that an employee may be terminated while on medical leave, as long as the taking of the FMLA leave was not the cause for the termination." *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 428 (S.D.N.Y. 2004).

In its motion, Time Warner does not dispute that 1) Warren is an eligible employee; 2) that Time Warner is subject to the FMLA; 3) that Warren was entitled to leave under the FMLA; and 4) that Warren gave notice to Time Warner of her notice to take leave. The only remaining issue is whether Warren was denied benefits to which she was entitled under the FMLA.

Warren maintains that she was denied a benefit under the FMLA when her employment was terminated prior to the conclusion of 90 days after she was placed on the PAP, which Warren alleges is the amount of time to which Warren was entitled under her 60-day PAP.  (Mot. at 12.)  Warren claims that she was entitled to 90 days to complete her PAP as a matter of Time Warner policy, demonstrated when Time Warner conducted Schlechter's final PAP review in May of 2016, 90 days after he was placed on the PAP.  (*Id.*)  Warren further claims that she was denied a benefit under the FMLA when her PAP was issued without the notice that it was a Final Written Warning, contrary to Time Warner's alleged policy.  (*Id.*)

Neither of these alleged infractions interfere with Warren's exercise of the benefits protected by the FMLA, namely twelve weeks of leave followed by reinstatement where eligible. *See Elliot-Leach v. New York City Dept. of Educ.*, 201 F. Supp. 3d 238, 244 (E.D.N.Y. 2016), *aff'd,* 710 Fed. Appx. 449 (2d Cir. 2017) (dismissing FMLA interference claim because plaintiff received all FMLA leave approved by her doctor).  Rather, Warren's request for FMLA leave was approved in full on May 17, 2016, for the period of April 20, 2016, to June 30, 2016, as her treating psychiatrist had specified.  (Pl.'s SOF at ¶ 36; Def.'s SOF at ¶¶ 95–96.)

Further, Warren was not entitled to reinstatement where her termination was based on events that occurred prior to her taking leave. *See Bergman*, 2018 WL 1402249 at *9.  To address this, Warren argues that her bereavement leave, which began on April 13, 2016, prior to the end of her 60-day PAP, should be considered "protected leave" because "the purpose of the leave was identical to the protected leave."  (Cross-Opp. at 3.)  Warren cites no authority under which bereavement leave should be considered protected leave, and fails to explain how the purpose of the bereavement leave – taken to mourn the loss of a family member – is identical to her FMLA leave, which Warren took to determine the appropriate medication and dosage to treat

18

her previously undiagnosed Bipolar II disorder. (Mot. at 11.) Further, to the extent that Warren alleges her dismissal was a result of her taking protected leave under the FMLA during or following her PAP, such an argument is properly considered as a claim of FMLA retaliation, not interference. *See, e.g., Greenberg v. State Univ. Hospital-Downstate Med. Ctr.*, 15-CV-2343 (PKC) (VMS), 2019 WL 4752018 at \*51 (E.D.N.Y. Sept. 9, 2019) (dismissing FMLA interference claim where plaintiff alleged both interference and retaliation after he was terminated following taking FMLA leave). Accordingly, Warren is not entitled to summary judgment, and Time Warner is entitled to summary judgment, on the FMLA interference claim.

## B. Warren's FMLA Retaliation Claim

Courts evaluate FMLA retaliation claims under the *McDonnell-Douglas* burden-shifting framework. *Potenza v. City of N.Y.*, 365 F.3d 165, 168 (2d Cir. 2004). To make a prima facie case of retaliation under the FMLA, the plaintiff must show "1) the plaintiff exercised rights under the FMLA; 2) [s]he was qualified for [her] position; 3) [s]he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Id.* If the plaintiff makes such a showing, the burden then shifts to the defendant to rebut the presumption of retaliation by producing evidence of a legitimate, non-discriminatory reason for the adverse employment action. *See Penberg v. HealthBridge Mgmt.*, 823 F. Supp. 2d 166, 180 (E.D.N.Y. 2011), *citing Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If the defendant carries this burden, then the plaintiff must have the opportunity to demonstrate that the reason presented by the defendant is mere pretext. *Tex. Dep't of Cmty. Affairs*, 450 U.S. at 254–55.

### i.   Prima Facie Case

Here, the parties do not dispute that Warren's use of FMLA leave was the exercise of a right under the FMLA, or that Warren's employment termination was an adverse employment action.  The disputed issues are whether Warren was qualified for the position, and whether the termination of Warren's employment occurred under circumstances giving rise to an inference of retaliatory intent.

### a.   Qualification

The qualification that it is necessary for plaintiff to demonstrate "is minimal; plaintiff must show only that he possesses the basic skills necessary for performance of the job." *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 151 (2d Cir. 2012), *quoting Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 92 (2d Cir. 2001).  In a case in which the employee has already been hired, the "inference of minimal qualification" is "easier to draw" because, in hiring the employee, the employer has indicated that the employee is minimally qualified for the role.  *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001).  Here, Warren was hired by Time Warner in 2014 and remained in its employ until July 1, 2016.  Regardless of any issues with her performance, a reasonable jury could find that Warren has sufficiently demonstrated that she was qualified for the position.

### b.   Inference of Retaliatory Intent

An inference of retaliatory intent may be shown either indirectly, by showing a close temporal proximity between the protected activity and the adverse action; or "through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct;" or "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  *Spaulding v. N.Y.C. Dep't of Educ.*, 2015 U.S. Dist. LEXIS 127076, at *153

(E.D.N.Y. Feb. 19, 2015), *citing Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010).  Where

"gradual adverse job actions began well before" the protected leave, a plaintiff must put forth

evidence in addition to close temporal proximity to create an inference of retaliatory intent.

*Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

Here, Warren claims that her termination was processed while she was on leave,

providing close temporal proximity; she claims that her comparators, Schlechter and Dell, were

treated more favorably than she; and she claims that Baxter's statement about the "coincidence"

between her PAP time and her FMLA leave evinces retaliatory animus.

### 1.  Comparators

A plaintiff seeking to demonstrate retaliatory intent through evidence of disparate

treatment must show that the she is "'similarly situated in all material respects' to the individuals

with whom she seeks to compare herself."  *Graham v. Long Isl. R.R.*, 230 F.3d 34, 39 (2d Cir.

2000) (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997)).  "Whether

two employees are 'similarly situated in all material respects' is determined 'based on (1)

whether they were subject to the same workplace standards and (2) whether the conduct for

which [they were] discipline[d] was of comparable seriousness.'"  *Dotson v. City of Syracuse*,

763 F. App'x 39, 42 (2d Cir. 2019) (quoting *Graham*, 230 F.3d at 40).  Courts have explained

that this standard requires a "reasonably close resemblance of the facts and circumstances of

plaintiff's and comparator's cases," *id.* at 43 (quoting *Graham*, 230 F.3d at 40), or an

"objectively identifiable basis for comparability,"  *Graham*, 230 F.3d at 40 (quoting *Cherry v.

American Tel. & Tel. Co.*, 47 F.3d 225, 229 (7th Cir. 1995).  "Whether two employees are

similarly situated ordinarily presents a question of fact for the jury."  *Graham*, 230 F.3d at 39.

Here, a jury could reasonably conclude that comparator Schlechter was similarly situated to Warren in all material respects but would have no basis to find disparate treatment between them. Like Warren, Schlechter was employed as a Customer Care Representative, and he too was supervised by Browne. Schlechter neither requested nor took FMLA leave. Yet, Warren fails to provide evidence to support the conclusion that Schlechter received more favorable treatment than she did when she took her FMLA leave. Both Warren and Schlechter were placed on 60-day PAPs after multiple notices of failure to meet their performance goals, failed to demonstrate improvement on at least three Key Metrics prior to the conclusion of the 60-day period, and were terminated in May 2016. Though Schlechter received a Final Written Warning and Warren did not, this discrepancy is not dispositive. Indeed, Warren may have overall been treated *more* favorably than Schlechter, given that Time Warner granted her full FMLA leave with health insurance benefits through June 30, 2016, extending after Schlechter's termination. Warren argues, presenting no supporting evidence, that Schlechter received an extra month to complete his PAP, while Warren did not. On a motion for summary judgment, such conclusory statements are insufficient to demonstrate a genuine dispute of material fact. Thus, no reasonable jury could conclude that Schlechter and Warren received disparate treatment that would give rise to an inference of retaliatory intent.

Warren also alleges that Gina Dell is a comparator employee who was treated more favorably than Warren. Even assuming that Dell and Warren were similarly situated, Warren fails to demonstrate disparate treatment. Whereas Dell successfully completed the second fiscal month in her PAP, and retained her position, Warren failed to meet her performance metrics in either fiscal month of her PAP and so her employment was terminated. Thus, no reasonable jury could find retaliatory motive based on comparison with Dell.

## 2.  Baxter's Statement

Warren points to Baxter's testimony as direct evidence of retaliatory motive.  Baxter

testified that she had said in a conversation about Warren that "it seemed like a coincidence"

when "all of a sudden she is absent" while on a PAP.  Warren asserts that the use of the word

"'disappeared' implied a negative connotation," though cites no case law to indicate to this Court

whether such a connotation is sufficient to find evidence of retaliatory motive.  (Cross-Opp. at

8.)   Time Warner counters that such a comment could be interpreted as a good faith belief that

Warren was abusing FMLA leave, as in *Belgrave v. City of New York*, which does not constitute

retaliatory intent violative of the FMLA.  *See* 95-CV-1507, 1999 WL 692034 at \*45 (E.D.N.Y.

Aug 31, 1999), *aff'd sub nom. Belgrave v. New York City*, 216 F.3d 1071 (2d Cir. 2000) (finding

that requesting additional medical information out of suspicion that plaintiff was abusing FMLA

leave was not violative of the FMLA).  Time Warner approved Warren's FMLA leave in full

without demanding additional documentation, so this comparison is inapposite.

Neither party presents evidence showing to whom Baxter made these comments, whether

others with authority over Warren's termination would have been aware of these comments, or

whether Baxter had the authority to recommend termination.  Though Baxter forwarded the

recommendation that Warren be terminated from supervisory employees to more senior

leadership, it is unclear whether she had authority to second-guess these recommendations or if

she was merely a conduit.  Absent this information, the Court cannot say whether Baxter's

statement provide evidence of retaliatory motive.  Assuming that Baxter's statement, coupled

with the close temporal proximity of Warren's termination and her FMLA leave, provide a

sufficient basis for a jury to find evidence of retaliatory motive, we proceed to step two of the

*McDonnell-Douglas* burden-shifting framework.

### ii.     Legitimate Reason for Termination

If Warren has met her burden to present a prima facie case of retaliation, as this Court assumes she has, then the burden shifts back to Time Warner to articulate—though they "need not prove—the existence of a nondiscriminatory reason for its actions." *McNulty v. Cty. of Warren*, 6-CV-843 (NAM) (DJS), 2019 U.S. Dist. LEXIS 36591, at *41 (N.D.N.Y. Mar. 7, 2019), *citing Tex. Dep't of Cmty. Affairs*, 450 U.S. at 254–56.  This burden is met if the defendant's explanation, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993).

Here, the undisputed record demonstrates that Warren did not meet her performance goals either during or prior to her PAP, despite regular coaching beginning in 2015.  The undisputed record also shows that Warren was aware that her failure to meet these performance metrics could result in the termination of her employment with Time Warner.  Finally, the undisputed record shows that six Time Warner employees approved her termination, which Time Warner states was initiated due to Warren's failure to successfully complete her PAP.  Time Warner has therefore presented a sufficient basis for a jury to conclude that Warren's employment was terminated for the legitimate, non-retaliatory reason of her persistent performance issues at work, separate and apart from her taking FMLA leave.

### iii.    Pretext

At step three in the *McDonnell-Douglas* framework, the burden shifts back to the plaintiff to demonstrate that the proffered reason for the adverse employment action is mere pretext.  In making this showing, the plaintiff may rely on the same evidence used to establish the prima facie case in order to establish that the employer's explanation is pretextual.  *See Chambers v.*

24

*TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) ("Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." (internal quotation marks omitted) (citations omitted)); *see also Quartey v. Schiavone Const. Co. LLC*, No. 11-CV-2037 (DLI) (CLP), 2014 WL 1276476, at *6 (E.D.N.Y. Mar. 27, 2014). At this third step, a court should evaluate the record as a whole. *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001).

Here, Warren has failed to sufficiently show that Time Warner's proffered explanation is mere pretext. Warren argues, without basis in the record, that her comparators were given an extra month to complete their PAPs while she was not. (Cross-Opp at 9.) She also argues that the follow-up meeting on April 6, 2016, entitled her to an additional 30 days from that meeting to complete the PAP, again citing nothing in the record to support the claim that her PAP was required to be extended into her leave period. (Mot. at 16.) The record shows that Warren's April 6, 2016, Performance Improvement/Corrective Action form stated that Warren's performance would be reviewed "on or about 30 and 60 days from the start of the Performance Action Plan" and states, in bold type, "at 60 days, a final review of your performance results will be completed." (Plaintiff's Mot. for Summ. J'mt., Ex. 8 (Doc. No. 30-8) at 1–2.) No reasonable jury could conclude that the Performance Improvement/Corrective Action form purported to extend Warren's PAP for another 30 days, or that she was actually subject to a 90-day PAP.

Further, Warren asserts that because she was improving during her PAP, even as she was still "marginally below arbitrary goals set for her," she should have been given extra time after returning from leave to work on her performance goals before she was terminated. (Cross-Opp. at 1.) In addition, contrary to undisputed evidence in the record that a Final Written Warning

was customary but not required in order to terminate employment, Warren argues that she could

only be fired after the receipt of a Final Written Warning.  (*Id.* at 9.)  Under the *McDonnell*

*Douglas* framework, it is not the Court's duty to "pass judgment on the soundness or credibility"

of a defendant's stated basis for its actions, but rather to determine whether the reasons given are

sufficiently "'clear and specific'" to raise a genuine issue of material fact related to the plaintiff's

claim.  *Velez*, 2009 WL 3817461, at *11 (quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 381

(2d Cir. 2003)).  All of Warren's objections, taken together as a whole, fail to provide a

sufficient basis upon which a jury could conclude that Time Warner's reason for Warren's

termination is pretextual and that her termination was actually retaliatory.

Accordingly, Warren is not entitled to summary judgment, and Time Warner is entitled to

summary judgment, on the FMLA retaliation claim.

## II.      Warren's ADA Disability Discrimination and Retaliation Claims

To establish a prima facie case of discrimination under the ADA for failure to

accommodate, a plaintiff must show that 1) she is a person with a disability under the meaning of

the ADA; 2) that her employer, who was covered by the ADA, had notice of that disability; 3)

with reasonable accommodation, she could "perform the essential functions of the job at issue;

and 4) that the employer has refused to make such accommodations."  *McBride v. BIC Consumer*

*Prods. Mfg. Co., Inc.*, 583 F.3d 92, 97 (2d Cir. 2009).

Warren's second cause of action alleges discrimination under the ADA for failure to

accommodate.  (Compl. at 5–6.)  Warren's claim fails because she was not disabled until after

the PAP ended and she began her FMLA leave.  It is undisputed that Warren's psychiatrist

submitted to Time Warner that the first date of Warren's disability was April 20, 2016.  Further,

even if Warren was disabled prior to the conclusion of her PAP period, Time Warner was not on

26

notice of that disability until the PAP period was over and she had taken FMLA leave.  The symptoms that Warren describes as putting Time Warner on notice that she was suffering from a disability – crying at work, appearing "upset," low motivation – are almost indistinguishable from the grief that one might expect Warren to be experiencing after the death of her grandmother, and so could not have put Time Warner on notice that she was suffering from some sort of a disability.  *See MacEntee v. IBM*, 783 F. Supp. 2d 434, 444 (S.D.N.Y. 2011) (defendant was not on notice of plaintiff's disability where plaintiff was diagnosed with depression, which manifested as difficulty thinking and concentrating, but did not inform defendant of her disability or limitations).

In her second cause of action, Warren also alleges retaliation under the ADA.  Section 12203 of the ADA declares that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act."  42 USCS § 12203.  To establish a prima facie case of retaliation under the ADA, a plaintiff must establish that (1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action.  *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000) (internal quotations omitted).  Here, Warren has not provided any evidence that she was engaged in a protected activity under the ADA, such as opposing discriminatory activity.  Therefore, her claim of retaliation under the ADA must fail.

Thus, Warren has failed to establish a prima facie case for disability discrimination or retaliation under the ADA and is not entitled to summary judgment.  Time Warner is entitled to summary judgment on both claims.

## III.    Remaining State Law Claims

Warren's remaining causes of action are brought under the New York City Human Rights Law.  "When district courts dismiss all claims independently qualifying for the exercise of federal jurisdiction, they ordinarily dismiss as well as all related state claims." *Artis v. District of Columbia*, 138 S. Ct. 594, 597-98 (2018) (citing 28 U.S.C. § 1367(c)).  Accordingly, this Court declines to exercise supplemental jurisdiction over and dismisses the state law claims in Counts Three through Seven without prejudice.

## CONCLUSION

For the reasons set forth above, Warren's motion for summary judgment is denied in full, and Time Warner's motion for summary judgment is granted with respect to Counts I and II, and the remaining counts dismissed without prejudice.  The Clerk of Court is respectfully directed to enter judgment in favor of defendant Time Warner and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      September 28, 2020

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge